CITY NATIONAL BANK *v.* McGRAW.

4-4062

Opinion delivered December 2, 1935.

*James B. McDonough* and *Joseph R. Brown*, for appellants.

*Warner & Warner*, for appellee.

McHANEY, J.  On July 16, 1929, appellee had on deposit in appellant bank upwards of $22,000 in a savings account at 4 per cent. interest.  On that date, the bank purchased for his account 22 bonds of $1,000 each of G. T. Cazort, paying therefor the sum of $22,282.26, which included the accrued interest on the bonds to that date.  The bonds were secured by a deed of trust on approximately 4,000 acres of lands belonging to said Cazort, and also all the gas rights of both Mr. and Mrs. Cazort under the lands owned by them.  The total amount of the bond issue was $200,000, and appellant bank was the trustee of the bond issue.  Gas in large quantities was produced from some of the lands in said mortgage and was sold to the Gas Company in Fort Smith.  The royalties paid to Cazort by the gas company in previous years had amounted to more than $50,000.  The royalties paid to the bank in 1929, from July to December amounted to $13,665.31.  For the year 1930, the gas royalties amounted to $27,971.44, but thereafter the consumption of gas gradually declined until, in 1934, the royalties amounted to only $11,120.73.  At the time that appellant bank invested appellee's funds in said bonds, July 16, 1929, appellant Nakdimen wrote appellee a letter advising him of this fact as follows:  "I have this day invested for you $22,000 bearing 6 per cent.  The bond is dated May 1st, and the interest will be due semi-annually, and the next interest will be due November 1st.

"I have charged your account with $22,282.26, the $282.26 being for accrued interest.  In other words, the bond has been bearing interest since May 1st.  We carried it for two and one-half months."

Appellee did not reply to this letter in any way.  On October 21, 1929, appellant, Nakdimen, for the bank, wrote appellee the following letter:  "I have today credited your account with $660, being interest for six months on Cazort bonds for $22,000, and herewith enclose duplicate deposit ticket covering same."  On May 1, 1930, and on November 1, 1930, like letters were writ-

ten to appellee by appellants advising him of the collection of the interest in said sum and enclosing a duplicate deposit ticket to cover same. Appellee did not respond to any of these letters in any way. On January 2, 1931, appellee, who lived in Clarksville, was in Fort Smith and received from the bank, at his request, a receipt for the bonds. He says that on this occasion, appellant Nakdimen made certain statements to him regarding the value of the bonds, that they were as good as gold, being secured by 4,000 acres of the best Arkansas River bottom lands and gas royalties that brought in from $40,000 to $50,000 a year, and that appellants promised him that at any time that he needed the money on the bonds he could get it. Thereafter, default was made in the payment of both principal and interest on some of the bonds, and certain of the bondholders instituted suit to foreclose in the Crawford Chancery Court, and appellee was made a defendant in this action. After considerable delay, appellee filed an answer and cross-complaint. He alleged the ownership of the bonds and sought a foreclosure thereof because of delinquencies in payment of interest and taxes, etc. His cross-complaint was against appellants in which he alleged that they had converted his funds on deposit in the bank and used same in purchasing the Cazort bonds; that this purchase was made by appellants without any authority or permission from him, and that he had been induced to acquiesce in the purchase by the false and fraudulent representations of Nakdimen made to him on January 2, 1931. He prayed judgment against appellants for the $22,000 with interest, and for a decree rescinding the agreement wrongfully procured from him by the fraudulent representations of appellants, and the wrongful concealment of material facts from him with reference to the nature and value of the property securing said bonds. Upon appellant's motion, appellee elected to rely upon his cause of action against appellants rather than upon the security of the bonds, and the case was transferred to the Sebastian Chancery Court, where, upon a trial of the issues joined, a decree was rendered against appellants for the sum of $22,000, with interest.

For a reversal of the judgment, counsel for appellants make two contentions that we think deserve consideration. One is that appellants were authorized by appellee to make the investment for him and the other is that the appellee, by his silence, must be held to have ratified the act of appellants in the making of the investment for him, even though done without his authority.

As to the first proposition, that is, whether appellee authorized appellants to make the investment, the evidence is in dispute. H. S. Nakdimen, son of appellant Nakdimen, and one of the officers in the bank, testified that appellee told his father in his presence to invest his money for him when he had anything good to invest in. Appellee had long been a customer of the bank and a long acquaintance and friend of appellant I. H. Nakdimen. The proof shows that he had great trust and confidence in Nakdimen's ability and integrity. He had in the past purchased through appellants Liberty bonds, and had sold same through them. He had again invested through appellants, in what is called the O'Leary bonds, which latter had been paid off through appellant bank, and the funds of appellee were deposited in a savings account at 4 per cent. As stated, these transactions had been handled for appellee by the bank and its president I. H. Nakdimen. Whether appellants had the authority from appellee to make this investment or not, it is undisputed that they thought they had the authority, for, immediately upon making the investments, they wrote appellee notifying him thereof. The trial court found on disputed evidence that appellants had no actual authority to invest these funds for appellee, and we cannot say that this finding is against the preponderance of the evidence, as appellee testified very positively that no such authority was given.

Now, as to the second point, we are of the opinion that it makes no difference under the circumstances of this case whether appellants had the actual authority to make the investment for appellee or not. Appellee admits receiving the letter dated July 16, 1929, advising him of the fact, and he admits that he did nothing to advise the appellants that the investment was not satis-

factory to him. All of the circumstances tend to show that, on the contrary, it was satisfactory to him. At the time this $200,000 loan was negotiated with Mr. Cazort, by the bank, it is undisputed in this record that the value of the property securing the indebtedness was greatly in excess thereof, and that it was considered as a good loan. Gas royalties on the land alone were thought to be amply sufficient to pay the principal and interest as it matured. In addition to this, the lands were thought to be of great value for farming purposes. There is nothing in this record to show that appellants negotiated this loan with Mr. Cazort in any way except in the best of faith and with the honest opinion that the security was amply sufficient to pay the debt. The fact is that the interest had been paid to the time of the bringing of this suit, and $49,000 of the principal had been retired, although some $60,000 in principal is in default. Not only was appellee notified immediately of the investment, but appellants collected the interest on the loan every six months for appellee's account, notified him thereof, and sent him a duplicate deposit slip showing such collections and credits. Not only this, but appellees' pass book was balanced after this investment was made, showing that his account had been charged with the amount thereof, and showing the credits for interest collections. Appellee appears to have been perfectly satisfied with his investment until the bonds began to default in the interest, at which time he became concerned about his security, and sought to hold appellants for his investment. In the meantime, the value of the security covered by this mortgage along with all other property began to decline and continued to decline. The royalties from the gas rights declined from upwards of $50,000 to about $13,000 per year, and the farm lands had greatly depreciated in value. We think the case of *Bank of Hatfield* v. *Clayton*, 158 Ark. 119, 250 S. W. 347, is an authority against appellee under the facts of this case. There Mrs. Clayton sued the bank for $1,000 she had on deposit in the bank, and which had been withdrawn by the check of the vice president of the bank. The vice president made a visit to the home of Mrs. Clayton and proposed that, if she

would permit him to withdraw $1,000 of the funds to her credit in the bank and lend it out, he could get 10 per cent. interest for her. The vice president testified that she consented to that arrangement, but she testified that she refused to do so for the reason that she needed the money for another purpose. The jury settled that issue of fact in favor of Mrs. Clayton. The vice president drew a check on the bank for $1,000 and signed Mrs. Clayton's name to it, withdrew the money and executed his own note to Mrs. Clayton with another as surety for that amount. He did that on June 5, 1921. On June 11, 1921, he wrote Mrs. Clayton that he had placed $1,000 for her at 10 per cent., and, if she happened to need it and would let him know a couple of weeks ahead, he would replace it. She received this letter but made no reply. Thereafter, on July 30, the bank gave her a statement of her account which showed the withdrawal of these funds. On October 1, 1921, she wrote the vice president a letter asking him to put the money back into the bank as she would need it by November 1st. She made no objection to the use of the funds until some time in November. The court submitted the question to the jury upon instructions which told the jury that she was entitled to recover unless it was found, from a preponderance of the evidence, that she authorized the loan of her funds, ''or that thereafter, being fully informed of all material facts with respect thereto, plaintiff expressly ratified said transaction either orally or in writing, or in her conduct to said defendant.'' In reversing the judgment, this court held that there was no evidence to submit to the jury as to whether she had objected to the statement of her account within a reasonable time; that the statement rendered to her by the bank at the end of July, 1921, constituted an account stated within the meaning of the law. The court said: ''The rule seems to be universal that the furnishing of a statement by a bank to a depositor where the items are sufficiently shown to put the depositor upon notice constitutes an account stated, to which objection must be made within a reasonable time, otherwise the account is final.'' The court further said: ''There was a delay of between two and three months

before any objection was made, and it was more than three months before it was insisted that the money had been wrongfully withdrawn. There were no undisclosed facts which might or might not have affected plaintiff's decision in repudiating the withdrawal of the fund. She says that she thought that Johnson was acting for the bank in making the loan, but she knew to a certainty that the money had been withdrawn from the bank, which had the effect of changing the status of the bank as her debtor, and the only fact which she claimed to misunderstand was that the money had been loaned out by Johnson instead of the bank; but she was aware of the precise method in which her money had been withdrawn from the bank, and it was her duty to object to this, if it was unauthorized.''

Appellee contends that there is no question of an account stated in this case, and that appellee was under no duty to speak. While it is true that there was no account stated, just as in the Bank of Hatfield case, there was notice to appellee of everything that was done, in addition to the fact that his pass book was balanced which reflected the actual condition of his account. We think appellee was under the duty to speak within a reasonable time after the withdrawal of his funds from the savings account, and that his objection made on January 2, 1931, if in fact he made any objection at that time, comes too late. It was his duty to act promptly on receipt of the letter of July 16, 1929, if he wished to repudiate the action of those who presumed to act as his agents, whether rightfully or wrongfully, and that he must have done so within a reasonable time. Not having done so within a reasonable time, he must be held to have ratified the act of his supposed agents, and cannot at this time recover against them. Appellee must be held to be the owner of said bonds and entitled to all of the rights given him under the mortgage securing same together with other bondholders.

The decree against appellants will be reversed, and the cause dismissed.